RANDY LEE FRAZIER,            )
                                       )
      Plaintiff,              )
                                       )
          v.              )     NO. 3:14-cv-01058
                                     )     CHIEF JUDGE CRENSHAW
SOCIAL SECURITY           )
ADMINISTRATION,         )
                                       )
      Defendant.         )

## MEMORANDUM OPINION

Pending before the Court is Randy Lee Frazier's Motion for Judgment on the Administrative Record (Doc. No. 14), to which Defendant Social Security Administration ("SSA") has responded (Doc. No. 17). Plaintiff did not file a reply to the SSA's response. Upon consideration of the parties' briefs and the transcript of the administrative record (Doc. No. 10),[1] and for the reasons set forth below, Plaintiff's Motion for Judgment will be **DENIED** and the decision of the SSA will be **AFFIRMED**.

### I. Magistrate Judge Referral

In order to ensure the prompt resolution of this matter, the Court will **VACATE** the referral to the Magistrate Judge.

### II. Introduction

Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act and an application for supplemental security income ("SSI") under Title XVI

---

[1] Referenced hereinafter by "Tr." followed by the page number found in bolded typeface at the bottom right corner of the transcript page.

of the Social Security Act on June 2, 2010,[2] alleging disability onset as of August 19, 2006, which was amended at the hearing to May 22, 2010, the day after a previous application for benefits was denied. (Tr. 19.) Plaintiff alleged the following impairments: (1) Osteoarthritis, degenerative joint disease, fibromyalgia; (2) Nerve damage; (3) Carpal tunnel syndrome; (4) Chronic Obstructive Pulmonary Disease; (5) Hyperactive thyroid-Graves' disease; (6) Cellulitis; (7) Bursitis; (8) Sleep apnea; (9) Bell's palsy; (10) MRSA; (11) Umbilical hernia; (12) Manic depression; (13) Bipolar disorder; (14) Antisocial personality; and (15) Anxiety. (Tr. 220.) His claim to benefits was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of his case by an Administrative Law Judge ("ALJ"). Plaintiff's case was heard before ALJ Shimer on September 18, 2012, when Plaintiff appeared with counsel and gave testimony. (Tr. 19.) Testimony was also received from an impartial vocational expert ("VE"). (Id.) At the conclusion of the hearing, the matter was taken under advisement until October 9, 2012, when ALJ Shimer issued a written decision finding Plaintiff not disabled. (Tr. 19-45.) That decision contains the following enumerated findings:

1. There is new and material evidence that relates to the unadjudicated period. This evidence largely influences analysis of the claimant's residual functional capacity and hence all later steps in the sequential evaluation process (Social Security Acquiescence Rulings 98-3(6) and 98-4(6)).

2. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

3. The claimant has not engaged in substantial gainful activity since May 22, 2010, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[2] The Act and implementing regulations regarding DIB (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and Supplemental Security Income (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the regulations) are substantially identical. Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The Court cites to the regulations interchangeably.

4. The claimant has the following severe impairments: Degenerative Joint Disease; Bursitis, bilateral shoulders; Chronic Obstructive Pulmonary Disease, with asthma; Depressive Disorder; Anxiety Disorder; Personality Disorder; Alcohol Abuse, by history (20 C.F.R. 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1(20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. [T]he claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c), except as follows: The claimant can stand for three hours, but no longer than one hour at a time, and can walk for three hours, but no longer than two hours at a time. He is further limited to jobs requiring no more than frequent reaching, handling, fingering or feeling with the bilateral upper extremities; with no postural activities of crouching or crawling; no more than occasional stooping or kneeling; and no more than frequent climbing or balancing. He is further limited to jobs that do not involve any exposure to unprotected heights or vibrations; no more than occasional exposure to humidity, wetness and temperature extremes; no more than occasional exposure to occasional dusts, fumes, odors, gasses and poor ventilation; and no more than frequent exposure to moving mechanical parts. From a mental perspective, the claimant is further limited to jobs involving simple, routine and repetitive tasks, involving instructions that are detailed but not complex.

7. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

8. The claimant was born on June 20, 1958, and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See S.S.R. 82-41and 20 C.F.R. Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from May 22, 2010, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 22, 24, 27, 29, 38-39.)

On February 28, 2014, the Appeals Council denied Plaintiff's request for review of ALJ Shimer's decision (Tr. 1-4), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. Id.

### III. Prior Claim and Finding

Prior to filing the current applications, Plaintiff filed applications for DIB and SSI on April 12, 2007. (Tr. 85.) In his prior applications, Plaintiff alleged a disability onset date of August 19, 2006. (Id.) Both applications were denied at the initial and reconsideration stages of state agency review. (Id.) Thereafter, Plaintiff requested *de novo* review of his case by an ALJ. (Id.) The prior ALJ, Ronald E. Miller, heard the case on January 28, 2010. (Id.) Plaintiff, who was represented by counsel, appeared and testified at the hearing, as did an impartial VE Gordon H. Doss. (Id.) At the hearing, Plaintiff amended the alleged onset date to June 20, 2008. (Id.) After the first hearing, but before a decision had been rendered, Plaintiff sent ALJ Miller a medical source statement from Steven L. Mann, M.D., a treating physician, which was received in evidence. (Id.) Based on Dr. Mann's statement, ALJ Miller sent interrogatories to VE Doss. Based on VE Doss' responses to the interrogatories, ALJ Miller scheduled a second hearing. The second hearing was held on May 11, 2010. (Id.) Plaintiff, represented by counsel, appeared and testified, as did a different VE, Kenneth Anchor. (Id.) At the conclusion of the hearing, the matter was taken under advisement until May 21, 2010, when a written decision finding Plaintiff not disabled was issued. (Tr. 85-104.)

In his written decision, ALJ Miller found that Plaintiff:

has the residual functional capacity to lift up to 50 pounds occasionally and carry 20 pounds occasionally, consistent with the performance of medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except as follows: The claimant is limited to jobs that take into account his ability to stand for three hours in an eight-hour work day and for one hour at a time, walk for three hours in an eight-hour work day and for two hours at a time, sitting for two hours in an eight-hour day and for two hours at a time. The claimant is further limited to jobs that do not involve or require pushing or pulling with either hand, but allowing for frequent reaching, handling, fingering, and feeling with either hand, the operation of foot controls frequently and bilaterally, with no crouching or crawling, only occasional stooping or kneeling, and with frequent climbing or balancing. The claimant is further limited to jobs which do not involve exposure to unprotected heights and vibration, with only occasional exposure to humidity and wetness, temperature extremes, with only occasional exposure to odors, fumes, and pulmonary irritants; having frequent exposure to moving mechanical parts and the operation of a motor vehicle; and having the ability to tolerate a quiet level of noise. The claimant is further limited to jobs that take into account the fact that he cannot walk a block at a reasonable pace on rough or uneven surfaces. With respect to the claimant's mental impairments, he is further limited to jobs that take into account his ability to understand, remember, and maintain concentration, persistence and pace for simple and detailed tasks; his ability to interact with the general public and [ ] others, albeit with some difficulty; and his ability to adapt to change, and set goals. Finally, with respect to the claimant's ability to travel alone, he is limited to jobs that take into account physical limitations in requiring that he travel with a companion, but that he has no serious mental limitations in being able to do so.

(Tr. 95.)

## IV. Review of the Record

After considering, at length, the large number of impairments ALJ Shimer found not severe (Tr. 24-27), ALJ Shimer summarized Plaintiff's hearing testimony and medical records as follows:

[T]he claimant has alleged a large number of impairments, a number of which were already found to be non-severe or even medically determinable in earlier portions of the decision. However, to summarize the testimony, he states that the biggest reason for his being unable to work relates to his alleged degenerative disc disease, degenerative joint disease and fibromyalgia. As before, he asserts the pain is everywhere. Due to the shoulder disorder, he has lost the effective use of his dominant right upper extremity (to the point where he must use his non-dominant left), only to experience worsening symptoms in the remaining extremity. Because of his alleged arthritis, he has lost substantial use of his

5

bilateral hands, to the point where he drops objects secondary to loss of grip and numbness, and he must also elevate his legs secondary to extensive swelling. He spoke of frequent headaches, and continues to assert residuals from a remote ankle injury. He also states he sustained nerve damage, but provided two different accounts for why it happened: initially he spoke of the damage brought on over time by his prior work, but later stated it was because of something that happened during an arrest. He is able to walk for 5-15 minutes before he must sit, is unable to sit for longer than five minutes before he must move, and is unable to stand for longer than 10-15 minutes. While standing or walking he has difficulty in balancing. He is unable to lift or carry more than 10 pounds. Movements by themselves tend to worsen pain. From a mental perspective, he spoke of a loss of focus or concentration from his anxiety and depression, has sleep disturbances, is unable to watch a 30-minute program or finishing tasks that he starts, and has frequent interpersonal difficulty. He also spoke of not being able to adjust to change.

* * *

**Review of Medical Evidence**. At the outset, there are a number of inconsistencies in the record. For instance, he asserted during testimony that since May 22, 2010, the claimant drinks no more than "occasionally," yet this does not account for the fact that he told the examiner during a mental consultative evaluation in September of 2010 that he routinely drinks beer and vodka, has 1-2 drinks on a routine basis, and that whenever he has visitors, he will drink "a case of beer, easy." This would seem to stretch the definition of "occasional" beyond the breaking point, and undermines his credibility in a general or overall sense. (*See also* Ex. C9-F, C10-F, where claimant admits to drinking on day he discharged firearm at a possum in backyard.) Moreover, just as many of his asserted symptoms were poorly supported--if at all--based on the prior record similar disconnects exist in the current record. If anything, there is actually less evidence now, especially from a physical standpoint, when compared to the earlier record.

With this preface in mind, the undersigned will conduct a review of the current medical evidence. This will be done on an exhibit-by-exhibit basis, in an approximate chronological sequence, except that there was some time overlap as between a few of the exhibits.

Exhibit Cl-F, from Steven Mann, M.D., covers the period between September 2006 and February 2009. As such, it is of attenuated relevance when it comes to the current unadjudicated period, especially seeing it is more than a year between the latest encounter in the file and the alleged onset date. The claimant acknowledges that he is not relitigating the time intervals covered in the prior decision. This exhibit corresponds to Ex.12-F in the prior decision.

Exhibit C2-F, from Northcrest Medical Center, covers the period between October 2008 and November 2009. Again, it is of attenuated relevance when it comes to the unadjudicated period, and was previously reviewed as Ex. 13-F in the prior decision.

Exhibits C3-F and C4-F8 consists of the mental consultative evaluation report of Marie E. LaVasque, M.S., M.A., and Susan R. Vaught, Ph.D., which was conducted on September 22, 2010. Although mentioned previously, his current history of alcohol use is worth repeating, as per the following narrative-

> Mr. Frazier denied any personal history of substance abuse. He explained, "I have no problems" with drinking. He denied ever experiencing a black out when intoxicated. He described his drinking as including both beer and vodka. He said that he routinely [has] "1 to 2" drinks, and when he has visitors he will drink "a case of beer, easy."

This suggests, at minimum, ongoing use of the substance since the time of the prior ALJ decision. Additional observations included the following-

• He drove himself to the place of the evaluation and came alone.

• "Mr. Frazier was verbose; he provided unsolicited and superfluous details regarding his life. Multiple times he steered the conversation to himself. He stressed, 'I'm married, but I live like a single man.' He talked about picking up women for sex, and stressed that his wife does not care. He described his home garage as his man cave," and described how lady friends "visit him there, drink, and enjoy each other."

• He denied hallucinations, suicidal ideation, and homicidal ideation, and he had an organized thought process, but with indications of grandiose delusions. His level of attention and concentration permitted him to perform serial-3 calculations and to spell a common word backwards, but he denied being able to perform serial-7 calculations.

• He endorsed a number of symptoms of anxiety and said that it was even at that moment an intensity of 6 on a 10-point scale; however, the evaluator pointed out that he didn't appear to exhibit anxious behavior during the evaluation, and his lifestyle didn't appear to be curtailed by the impairment.

• He further endorsed symptoms consistent with depression, such as feelings of sadness and loss of interest in things he used to enjoy and a sense of personal failure; however, all of these things were inconsistent with his other statements and his clinical presentation.

• There was some evidence of memory impairment as the claimant remembered one of three unrelated objects after a five-minute delay, together with a second object with prompting. It was not immediately clear whether alcohol use contributed to this. Although the claimant was ostensibly cooperative on this occasion, his tendency to highlight or amplify symptoms—to the point where the evaluator concluded that his clinical presentation was inconsistent with a number of his allegations—tends to still undermine the validity of memory testing on this occasion.

• He acknowledged not receiving any treatment from a mental health provider as of the date of the encounter, except that he was court-ordered to be evaluated by Mental Health Cooperative at a later date in the aftermath of an arrest for aggravated assault (see Ex. C9-F).

The claimant received a diagnosis of alcohol abuse/dependence on Axis I and personality disorder on Axis II. He also received a Global Assessment of Functioning (GAF) score of 70, indicative of only mild symptoms of mental functioning (*see* Diagnostic and Statistical Manual, Fourth Edition, Text Revision (DSM-IV-TR) (2000, p. 34)). Each of the evaluators concluded the claimant could understand simple to complex instructions, but appeared to have mild impairment with short-term memory. Regarding concentration and persistence, "[his] attention and concentration [was] intact and he appeared to have the ability to sustain concentration, but he may have trouble maintaining a consistent work schedule due to personality issues and possible substance abuse." The report went on to say he would have difficulties interacting with others secondary to the claimant's self-report of sexually provocative or inappropriate behavior, and that because of his inflexibility, it is difficult for him to adapt to work-related change. These items of opinion evidence will be taken up again later in the decision.

The claimant's physical consultative evaluation, conducted by Brannon Mangus, M.D. on September 27, 2010, appears at Ex. C5-F. He alleged that arthritis was among his severe impairments, but curiously, alleged that its onset was about six months before, or sometime in early 2010 (*compare* Ex. Cl-A at 16-17, in which he alleged osteoarthritis during the prior adjudicated period, located "in all joints," that was 10 on a 10-point scale "99 percent of the time."). He asserts he drinks just an occasional light beer, but this is clearly at variance with what he told the examiner during the mental consultative evaluation, and again undermines his general or overall credibility (compare Ex. C3-F, C4-F). On this occasion, he was alert and oriented in all spheres, without any apparent distress. He exhibited significant differences between consultative evaluations under circumstances already suspicious for credibility concerns and symptom magnification, as follows-

| Attribute | 2007 Evaluation (Ex. 3-F from original file) | 2012 Evaluation (Ex. C5-F from current file) |
|---|---|---|
| Gait | Normal | Unsteady, broad-based, antalgic |
| Mobility | Normal | Decreased due to gait |
| Remarks regarding reliability and/or veracity | "The patient complained of significant pain … that seemed out of proportion to the examination." | Cooperative, but "his reliability was questionable." |
| Movement to/from chair | Without difficulty | With difficulty |
| Grip strength | Reduced in left hand, greater strength in right hand | Reduced in *right* hand (but same force as before), with greater strength in *left* |
| Assistive device(s) | None specified | Alleges using cane at home |
| Strength | 5/5 in all groups; "He was in excellent condition. No muscle atrophy." | 5/5 in all groups except 3/5 over right shoulder |
| Range of motion, lumbar | Normal | Mildly reduced (80 degrees flexion, 20 degrees extension, 20 degrees lateral flexion) |
| Range of motion, shoulders | Reduced in both, right worse than left, but moderate overall | Reduced in both, but markedly reduced on right (i.e., 70 degrees of active abduction, 75 degrees of active forward elevation |
| Range of motion, hips | Normal | Reduced on right in all planes |
| Straight leg raises | Negative | Positive, bilaterally (specific measurements unrecorded) |

In the "Findings/Diagnoses" section, Dr. Mangus listed "Decreased Range of Motion" of the back, right hip, and bilateral shoulders (right more than left), and with tobacco abuse; he went on to opine the claimant could lift and/or carry 20 pounds occasionally, 20 pounds frequently, stand for about six hours, and sit without restrictions.

Exhibit C9-F consists of a single encounter, dated October 20, 2010, at Mental Health Cooperative. This was for a court-ordered assessment, which in turn was prompted by an incident in which—solely according to the claimant—he was discharging a firearm at a possum on his property, which in turn alarmed his allegedly intoxicated spouse to call police. (However, *see* Ex. C10-F, in which the claimant admits drinking on the day of the incident, and C3-F, in which he accuses his stepdaughter of calling the police.) He asserted that he was diagnosed with bipolar disorder by a doctor he was sent to by "Disability Determination," seemingly a reference to a prior consultative evaluation. Also on this occasion, he

claimed to stop using alcohol, save for 2-3 times per month.  He admitted that he used to have an anger problem, but is able to control it now; he went on to say that he has depressive symptoms that started around the time he first started seeking disability benefits.  He attributed his inability to work as being because of his physical impairments.  There were no objective findings, but rather, the clinician told the claimant he could benefit from counseling and should be evaluated for an antidepressant, but was not eligible for MHC services for insurance reasons.  The exhibit ends there.

Apparently the claimant was referred to Centerstone, because according to Ex. C10-F, it shows an intake date of October 25, 2010, or just after the MHC encounter.  On this occasion, he states he was arrested because, as before, he was shooting at a possum to scare it away, and that he was being "railroaded" because of a prior criminal history.  His story changes, however: This time, it was a family member who called police, who in turn alleged he was shooting at his wife; he again admitted to drinking on the day of the incident.  He tried to obtain an evaluation by a licensed psychologist and was told it was not available there, but only at Vanderbilt.  He specifically denied seeking treatment.  Mentioned at the hearing was where the claimant receive a Global Assessment of Functioning (GAF) score of 40 (*see* Ex. C10-F at 8), but this appears to be in error:  His Tennessee Clinically Related Group (TCRG) assessment reflects mild to moderate limitations across all functional areas, and includes a GAF score of 59, signifying only moderate symptoms of mental functioning.

The encounter at United Neighborhood Health Services, dated November 10, 2010, and appearing at Ex. C133-F, was related to the court order as well.  At this point, a third version of the underlying incident emerges:  This time, the claimant alleged that he was suicidal, got mad, and shot at a possum.  (Seemingly, then, the possum is the only constant element as to what actually happened.)  In any event, he states he was previously provided with medication by his primary care provider, described as Levoxyl and Ativan, and that his anxiety symptoms were well controlled for many years.  Currently he alleges symptoms encompassing depression and anxiety.  Following a very terse mental status report, Jennifer Betts, a nurse practitioner (*see* Ex. C18-F at 7), diagnoses the claimant with affective psychosis, not otherwise specified; generalized anxiety disorder, insomnia and personality disorder, not otherwise specified.  She prescribes Ativan, Tegretol, Trazodone, and Ranitidine.

The only other encounter with this provider in the exhibit is dated December 8, 2010.  On this occasion, he reports that he was denied again for disability two days before (*see* Ex. C4-B), yet mood swings had improved "much," and Ativan continues to be helpful for anxiety symptoms also.  The claimant's trazodone was increased due to reports of continued sleep disturbance. And this is where the exhibit ends.

Exhibit Cl7-F, from Northcrest Medical Center, relates mainly to an emergency room encounter that happened on September 8, 2011. On this occasion, he presented with swelling on the left side of his face. Although he was diagnosed with cellulitis, it was in the setting of dental caries. He was prescribed Bactrim DS, Augmentin and Lortab and released in a stable condition. In a follow-up encounter on September 12, the claimant reported that the swelling in his face improved, but that he experiences increased swelling in the neck, and that it was harder for him to swallow. He continued to be treated for cellulitis, [ ] but with a change in medicines. There were no further encounters related to this event.

Exhibit C18-F, from United Neighborhood Health Services, begins with a report of mood and anxiety symptoms, dated November 7, 2011, that had a large situational component (i.e., has multiple girlfriends that he interacts with over the computer; reported marital difficulties; and stepdaughter and her children are at his place every other weekend and there is much noise and commotion). Notably, the only physical health problems the claimant noted involved hypothyroidism and "bad teeth." Also of note, the claimant was not compliant with prescribed medication, stating that he stopped taking it shortly after the previous encounter from 2010, and he had not taken his thyroid medication in six months.

The only other encounter in this file, dated May 25, 2012, states the claimant was anxious since the night before because his spouse had threatened to call the police on him; a son had disinvited him from a graduation barbecue, and the claimant was seeking disability paperwork. It was not immediately clear whether the claimant was taking any of his prescribed medications at this point, seeing that he was supposed to have returned to this provider back in January.

**Summary of Medical Evidence**. Despite the lengthy description of the evidence as contained above, it can really be summarized in a single paragraph as follows. With respect to the claimant's physical impairments, there was actually very little evidence, apart from the consultative evaluation, that is directly relevant to the period in question. As noted above, it appears the only significant concern that was documented in treatment records following the date of the prior decision was a case of dental caries that escalated into a series of emergency room visits for facial cellulitis, and even this appeared to resolve following the last encounter. One sees large blocks of time where no treatment is recorded at all, even though the claimant has demonstrated he is able to use the emergency room when the need arises. Similarly, with respect to the claimant's mental impairments, there is again little to go on: His treatment history as a whole is spotty, and this is especially the case in the current file. Even in the times when he saw a clinician (and even this appears largely triggered by a court order), he demonstrated that he was not motivated to seek help (see Ex. 10-F), and he certainly was not willing to follow medical advice when it came to taking prescribed medications for his symptoms of mental functioning (*see, e.g.*, Ex. 18-F). Even in the last set of records, at Ex. 18-F, the claimant was not receiving any counseling.

**Review of Opinion Evidence, Physical**. Brannon Mangus, M.D., opined the claimant could lift and/or carry 20 pounds occasionally and 20 pounds frequently, sit without restrictions, and stand and/or walk for about six hours (Ex. C5-F). In this instance, I give marginal weight to the report. On the one hand, it is not restrictive enough in the sense the evidence from the original file shows that he is only able to sit, stand or walk for limited intervals of time, and these limitations are preserved above. On the other hand, the undersigned genuinely questions a portion of the objective findings, such as those relating to one-sided range of motion limitations, seeing that there is little objective evidence elsewhere in the record relating to such a medical condition, and especially given multiple instances where the claimant's reliability was expressly called into question.

State agency medical evaluations were generally not restrictive enough, in the sense it did not add significant standing or walking limitations, and omitted a number of substantial postural and environmental limitations. In fact, one of the evaluations called for a full range of medium work and omitted all other restrictions (Ex. C12-F, C16-F). The undersigned provides little weight to the extent of these inconsistencies; however, there is ample reason to agree the claimant can lift or carry in a manner consistent with medium work, for this is largely consistent with the original decision, and because there is little in the current record that supports only light or sedentary levels of exertion.

**Review of Opinion Evidence, Mental**. Marie E. LaVasque, M.S., and Susan R. Vaught, Ph.D., provided internally inconsistent conclusions. On the one hand, they provided the claimant with Global Assessment of Functioning (GAF) score of 70, suggesting no more than a mild degree of mental limitations. On the other hand, the report went on to say he would be unable to maintain a consistent work schedule despite having the ability to sustain concentration; is unable to interact appropriately with others based primarily on the claimant'' own report, and is unable to adapt to work-related change even though he did not objectively manifest this during the evaluation (Ex. C3-F, C4-F). In that regard, there appear to be only two explanations for the apparent disconnect. First, the evaluators hinted at the claimant's alcohol use as contributing to his mental limitations. In this instance, it is not necessary to reach a conclusion that the claimant's substance use is material to any determination of disability or non-disability, because the weight of the evidence as a whole tends to show fewer limitations even when alcohol is involved. Second, the evaluators appeared to rely disproportionately on the claimant's subjective complaints regarding the nature and extent of his mental limitations; however, as we have seen, there are sufficient inconsistencies in the claimant's versions of events that it is impossible to rely on them. Therefore, the report at Ex. C3-F cannot stand for the proposition the claimant has greater limitations then those adopted above.

Several GAF scores were provided in the course of treatment records from Centerstone, Mental Health Cooperative, and United Neighborhood Health Services. Most were actually consistent with someone who had, at worst, only a moderate degree of mental impairment. Even as to the one instance where the GAF score was given at 45, there was a Tennessee Clinically Related Group (TCRG) report, completed on the same day, that showed at GAF score of 59 with moderate or fewer limitations in all functional areas, strongly suggesting that the score of 45 was provided in error. In fact, the TCRG report indicating a GAF score of 59 was indicated to be "CRG assessment- correction." (Ex. 10-F at 9-12). He also received a GAF score of 58 as of May 2012 (Ex. 18-F at 2). Therefore, these reports do not support a finding of greater functional limitations, regardless of the level of weight provided to them. For on the one hand, there is reason to support the higher GAF scores, because this receives the greatest support from the weight of the evidence. On the other hand, if we were to give neutral or low weight to the scores, it would need to be with all of them equally, because of the very limited exposure each provider had with the claimant. Either scenario is not favorable to him in the final analysis.

State agency assessments regarding the claimant's mental limitations were generally less restrictive, in the sense they allowed for more than simple, routine and repetitive tasks (Ex. C8-F C14-F); however, the undersigned would conclude that this restriction remains appropriate in the claimant's case. The undersigned agrees with the overall tenor of these reports that he does not have significant interpersonal limitations and can handle more frequent workplace-related change, but would depart from them to the extent of any need to work with things rather than people, because this was not as well supported in the balance of the evidence, especially with respect to the claimant's own declination of treatment at Ex. 10-F.

**Conclusion**. For the foregoing reasons, the residual functional capacity appearing above is not identical, but is largely intact in comparison with the prior decision. However, it is modified in two fundamental respects. First, as mentioned, there is not any evidence that points to the existence of a hearing disorder, and for that reason, there are no corresponding hearing limitations. Second, the current record is different in the sense there is no significant evidence of limitation from an interpersonal standpoint, except insofar as they are mild (pursuant to the above psychiatric review technique analysis).

(Tr. 31-37.)

# V. Conclusions of Law

## A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

**B. The Five-Step Inquiry**

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her

impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting S.S.R. 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. § 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

## C. Plaintiff's Statement of Errors

As his first claim of error, Plaintiff contends that ALJ Shimer did not evaluate medical opinion evidence consistent with Sixth Circuit precedent or the Social Security regulations. Specifically, Plaintiff alleges that ALJ Shimer erred: (1) in not giving sufficient weight to the opinion of examining state agency mental health evaluators Susan Vaught, Ph.D., and Marie LaVasque, M.S., (hereinafter "the Evaluators");[3] (2) in giving the opinions of non-examining state agency medical consultants, Horace Edwards, Ph.D., and Edward Sachs, Ph.D., (hereinafter the "Consultants") more weight than he gave the Evaluators' opinion and failing to sufficiently explain why; and (3) in judging the Evaluators' opinion more harshly than he judged the Consultants' opinions. In opposition, Defendant argues that substantial evidence supports the ALJ's RFC finding. Defendant contends that ALJ Shimer reasonably gave the Evaluators' more restrictive findings less weight because they disproportionately relied on Plaintiff's subjective complaints, failed to support their opinion with objective medical evidence, and were internally inconsistent. Additionally, Defendant contends that while ALJ Shimer assigned some weight to the Consultants' opinions, he only credits their opinions as supported by objective medical evidence. Finally, Defendant contends that ALJ Shimer appropriately weighed the opinions of the Evaluators and the Consultants and gave each opinion some weight consistent with the evidence as a whole.

---

[3] It is unclear from the record whether Dr. Vaught, who signed the Mental Status Report, conducted Plaintiff's evaluation alone, or whether Ms. LaVasque, who did not sign the report, but who appears to have submitted it through the SSA's electronic filing system and whose vendor account appears to have been paid, also evaluated Plaintiff. (See Tr. 350-52.) In their discussion of the mental health evidence, the parties name both Ms. LaVasque and Dr. Vaught, however, it is important to note that only one Mental Status Report was made part of the record.

Social security regulations and rulings establish the framework for an ALJ's consideration of medical opinions. See 20 C.F.R. §§ 404.1527, 416.927; S.S.R. 96-2p. Acceptable medical sources are divided into three categories: treating sources; examining but non-treating sources; and non-examining sources. Id. A treating source "means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation" consistent with accepted medical practice, and "who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527. An examining, but "nontreating source . . . has examined the claimant but does not have, or did not have, an ongoing treatment relationship with h[im]." Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007) (internal citation and quotation marks omitted). A "nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." Id. (internal citation and quotations marks omitted).

"When evaluating medical opinions, the SSA will generally give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [him]." Id. (internal citations and quotations marks omitted). However, the SSA is only required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010) (internal citation omitted). Indeed, the Sixth Circuit has long held that the that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." Wright v. Colvin, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept. 30, 2016) (citing Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 506-07

(6th Cir. 2006). Likewise, the ALJ is "under no special obligation" to provide great detail as to why the opinions of the nonexamining providers "were more consistent with the overall record" than the examining, but nontreating providers. Norris v. Comm'r of Soc. Sec., 461 F. App'x 433, 440 (6th Cir. 2012). As long as "the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements. . . ." Id.

An ALJ may reasonably find that an internally inconsistent medical opinion is unreliable. See Vorholt v. Comm'r of Soc. Sec., 409 F. App'x 883, 887-889 (6th Cir. 2011); see also White v. Comm'r of Soc. Sec., 572 F.3d 272, 286 (6th Cir. 2009) (holding that an ALJ's finding that a medical opinion conflicts with other evidence in the record is a sufficient reason to discount the opinion); 20 C.F.R. § 404.1527(c)(2) ("If any . . . medical opinion(s) is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence . . . ."); id. at § 404.1527(d)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Moreover, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [an ALJ] will give that opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); see also Bell v. Barnhart, 148 F. App'x 277, 285 (6th Cir. 2014) (declining to give weight to a doctor's opinion that was supported by only the claimant's reported symptoms). Finally, a claimant's failure to seek mental health treatment calls into questions the credibility of his or her claims regarding disabling mental health impairments. See Payne v. Comm'r of Soc. Sec., 402 F. App'x 109, 114 (6th Cir. 2010); see also White, 572 F.3d at 284 (holding that where there was no evidence in the record explaining claimant's failure to seek treatment during a half-year gap, "[a] 'reasonable mind' might . . . find that the lack of treatment . . . indicated an alleviation of claimant's symptoms); Plank v. Sec. of Health & Human Servs., 734 F.2d 1174, 1176 (6th Cir.

1984) (holding that claimant's "attitude" in refusing psychiatric treatment "cannot serve as an excuse" entitling him to disability benefits).

ALJ Shimer accorded the Evaluators' opinion some, but not substantial, weight because he found that it "provided internally inconsistent conclusions." (Tr. 36.) For example, ALJ Shimer noted that the Evaluators opined that Plaintiff would be unable to maintain a consistent work schedule, would be unable to interact appropriately with others, and would be unable to adapt to work-related changes. (Tr. 36-37.) But, the Evaluators noted that Plaintiff had a Global Assessment Functioning (GAF) score of 70,[4] suggesting no more than mild mental limitations. (Tr. 36.) Additionally, the Evaluators opined that Plaintiff was able to sustain concentration and did not objectively manifest any signs that he was unable to adapt to work-related changes. (Tr. 36-37.) Further, ALJ Shimer noted that the Evaluators opined that Plaintiff could not interact appropriately with others based largely on Plaintiff's own statements. (Tr. 37.) Finally, ALJ Shimer noted that these internal inconsistences in the Mental Status Report may result from Plaintiff's alcohol use contributing to his mental limitations, or because the Evaluators relied "disproportionately" on Plaintiff's subjective complaints which the ALJ had already concluded were, at best, unreliable, regardless, these inconsistencies undermined the reliability of the Evaluators' opinion. (Tr. 37.) As a result, ALJ Shimer found that, to the extent the Evaluators' opinion conflicted with the RFC, it must be rejected. Substantial evidence supported ALJ

---

[4] "Global Assessment of Functioning represents the examiner's judgment of the individual's overall level of psychological functioning." Doud v. Comm'r of Soc. Sec., 314 F. Supp. 2d 671, 674 n. 2 (E.D. Mich. 2003) (quoting American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000)). The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. White, 572 F.3d at 276. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id.

Shimer's decision to accord some weight to the Evaluators' opinion and ALJ Shimer sufficiently explained why the Evaluators' opinion was entitled to the weight he assigned.

With respect to Plaintiff's complaints regarding the weight ALJ Shimer gave to the Consultants' opinions, ALJ Shimer found that while the Consultants' opinions were "generally less restrictive" because "they allowed for more than simple, routine and repetitive tasks," the record evidence supported the more stringent restrictions as set forth in the RFC. (Tr. 37.) Additionally, ALJ Shimer found that while the evidence largely supported the Consultants' opinions, there was no evidence to support the limitation that Plaintiff needed to "work with things rather than people. (Id.) Substantial evidence supported ALJ Shimer's finding that certain aspects of the Consultants' opinions were entitled to some weight, while other aspects were reasonably rejected.

With respect to Plaintiff's suggestion that ALJ Shimer gave the Consultants' opinions more weight than the Evaluators' opinion, it is not entirely clear that this is so. It is also not clear, as Plaintiff baldly claims, whether ALJ Shimer more closely scrutinized the opinions of the Evaluators than he did the opinions of the Consultants. What is clear is that ALJ Shimer culled restrictions that were supported by the evidence from all of the mental health opinions and rejected those restrictions for which objective medical evidence was lacking. ALJ Shimer did not err in evaluating the medical opinion evidence and the mental restrictions that were ultimately made part of the RFC and were supported by substantial evidence.

As his second claim of error, Plaintiff argues that ALJ Shimer failed to properly consider all of the Tennessee Clinically Related Group ("CRG") reports[5] in the record, failed to properly

---

[5] "Clinically Related Group . . . assessments are used to provide operational definitions based on Federal guidelines for classifying mental health service to consumers. . . ." Hudson v. Colvin,

credit the opinions of medical sources who prepared the CRG reports, and failed to recognize that the CRG forms' definition of moderate limitation corresponded to the SSA definition of marked limitations, and thus erred in not appropriately recognizing the level of Plaintiff's impairment. Defendant responds that ALJ Shimer considered both CRG forms, properly weighed the CRG forms as opinion evidence, and did not err in determining that the objective medical evidence did not support any limitations in the CRG forms beyond the limitations set forth in the RFC.

As an initial matter, ALJ Shimer expressly recognized that providers from Centerstone Community Mental Health Care Centers (hereinafter "Centerstone") completed two CRG reports on October 25, 2010. (See Tr. 36.) One CRG form was noted to be "initial," (Tr. 403), and one was noted to be a "correction," (Tr. 398). In the initial CRG form, Plaintiff was noted to have several marked impairments and a Global Assessment of Functioning ("GAF") score of 45.[6] In the corrected CRG form, Plaintiff was noted to have mild to moderate limitations and a GAF score of 59. Since the other GAF score in the record was 58 and thus more consistent with the corrected GAF score of 59 than the initial score of 45, and the record evidence is more consistent with a score of 59, ALJ Shimer found that "these reports do not support a finding of greater functional limitations" than those included in the RFC. (Tr. 37.) Additionally, ALJ Shimer noted that whether he gave weight to the GAF score of 59 because it was supported by record evidence, or alternatively determined that the GAF scores, as a whole, should be "give[n] neutral or low weight" due to the uncertainty over the appropriate GAF score and the "very limited

No. 3:14-CV-01239, 2015 WL 1868546, at *1 n.2 (M.D. Tenn. Apr. 23, 2015), report and recommendation adopted, No. 3:14-cv-01239, 2015 WL 4771557 (M.D. Tenn. Aug. 12, 2015) (citation omitted).
[6] See note 4 supra.

exposure each provider had with [Plaintiff]," the CRG Reports and GAF scores contained therein did not support additional mental limitations beyond those included in the RFC. (Id.)

Even if ALJ Shimer's conclusion regarding the significance of the CRG reports and GAF scores contained therein, was not supported by substantial evidence, a GAF score, by itself, is not particularly helpful in assessing Plaintiff's limitations. "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 502 n.7 (6th Cir. 2006). Moreover, GAF assessments are "isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis." White v. Colvin, 2014 WL 2813310, at *10 (S.D. Ohio, June 23, 2014) (adopted by 2014 WL 3510298 (S.D. Ohio July 14, 2014)). The Sixth Circuit has explained that a GAF score is not dispositive of anything in and of itself, but rather is only significant to the extent that it elucidates an individual's underlying mental issues. See White, 572 F.3d at 284; see also 65 Fed. Reg. 50746, 50764–65 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings."). Moreover, the Sixth Circuit has held that even an ALJ's failure to refer to a claimant's GAF score does not make his or her RFC analysis unreliable. Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) (noting that "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.")

Plaintiff's claim that ALJ Shimer failed to properly credit the opinions of the medical sources who prepared the CRG reports, is patently false, not least of which is because the ALJ considered Plaintiff's mental health treatment records from Centerstone, Mental Health

Cooperative, and United Neighborhood Health Services and the CRG forms within the section marked "Review of Opinion Evidence, Mental." (See Tr. 36-37.) What is more, as fully explained above, ALJ Shimer had no obligation to explain in great detail the weight that he gave to the opinions of medical sources who were neither acceptable medical sources nor treating medical providers. ALJ Shimer thoroughly reviewed all of the mental health opinion evidence and concluded that the RFC amply covered Plaintiff's mental health limitations. Substantial evidence supported this conclusion.

Finally, as to Plaintiff's claim that ALJ Shimer failed to recognize that the CRG forms definition of moderate limitation corresponded to the SSA definition of marked limitation, he is mistaken. SSA regulations note that "marked" limitations means "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, while moderate limitations means "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." Id. Similarly, the CRG form defines marked limitations as limitations involving "extensive problems" that require "frequent assistance," while moderate limitations involve "regular or frequent problems" which require "frequent assistance" to "perform up to acceptable standards." (Tr. 398-99, 403-04.) Moreover, to the extent that the "moderate" restrictions in the CRG form suggest limitations beyond those in the RFC, ALJ Shimer's decision sufficiently explained why he did not credit such extreme limitations in this case. (Tr. 29-37, 398-99.)

As his third claim of error, Plaintiff argues that ALJ Shimer failed to properly consider all of Plaintiff's impairments and failed to provide sufficient reasons for not finding these impairments to be severe. Specifically, Plaintiff contends that ALJ Shimer erred by failing to find his fibromyalgia severe and by failing to sufficiently explain why Plaintiff's fibromyalgia

was not a severe impairment.[7] Respondent argues that the SSA's rule 12-2p regarding fibromyalgia, issued after the hearing but before ALJ Shimer's decision, constitutes a "changed circumstance" and as a result, ALJ Shimer was not bound by ALJ Miller's finding that Plaintiff's fibromyalgia was a severe impairment. Additionally, Respondent argues that substantial evidence supported ALJ Shimer's finding, under S.S.R. 12-2p, that Plaintiff's fibromyalgia was not a severe impairment.

ALJ Shimer fully discussed the provisions of S.S.R. 12-2p[8] and thoroughly explained why Plaintiff's fibromyalgia was not a severe impairment. (Tr. 22-24.) ALJ Shimer stated, in pertinent part:

> Social Security Ruling 12-2p, relating to analysis of fibromyalgia, was promulgated since the date of the last decision. . . . Of note, based on the prior ALJ's analysis of the record regarding the claimant's fibromyalgia, as quoted below, it is exceptionally unlikely this would be considered a severe impairment under the ruling-
>
>> Turning first to the claimant's alleged fibromyalgia: *The sole reason for its inclusion as severe impairment was to provide both the claimant and the treating physician with the benefit of the doubt* and in further light of Dr. Mann's medical source statement which lists the condition among the claimant's impairments, together with a finding of fibromyalgia as part of the physical consultative evaluation report "per patient report" [*see* Ex. 3-F at 11 from original file]. There would have otherwise been little basis to conclude that the claimant even had a severe impairment, due to the lack of objective medical studies or findings that would have supported the contention that the claimant has the condition at all, let alone that it has the requisite degree of severity and limiting effects (Ex. C1-A at 17, *emphasis added*).
>
> As the ruling indicates, fibromyalgia is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or

---

[7] Although Plaintiff states in general terms that ALJ Shimer failed to properly consider all of his impairments, he only presents arguments regarding the ALJ Shimer's finding with respect to his fibromyalgia. Accordingly, only this finding is discussed here.

[8] See 77 Federal Register 143 (July 25, 2012), at 43640-44, entitled "Evaluation of Fibromyalgia;" effective as of its publication date.

nearby soft tissues that has persisted for at least three months. When a person seeks disability benefits due in whole or in part to fibromyalgia, we must properly consider the person's symptoms when we decide whether the person has a[ ] medically determinable impairment of fibromyalgia. Once it is established the impairment is medically determinable, we must then ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes her from performing any substantial gainful activity. This of course is consistent with how other impairments are analyzed for purposes of the sequential evaluation process.

As with all impairments, fibromyalgia is a medically determinable impairment, in the first instance, when a diagnosis is provided by an acceptable medical source. However, according to the ruling, we cannot rely upon the physician's diagnosis alone; it must also be consistent with the medical evidence. For a physician's diagnosis of fibromyalgia to be consistent in this way, S.S.R. 12-2p looks to two sets of criteria that are used. The first is from the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia (hereafter the "1990 Criteria"), while the second is known as the 2010 ACR Preliminary Diagnostic Criteria (hereafter the "2010 Criteria"). The reader is directed to the text of the ruling . . . for a complete and illustrated description of the criteria, which by itself is quite involved and technical. For our purposes, it suffices to say that based on the 1990 Criteria, conditions for a diagnosis of fibromyalgia are met where there is all three of the following-

- [1.] A history of widespread pain, that is, pain in all quadrants of the body (the right and left sides, both above and below the waist), and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted for at least three months. The pain may fluctuate in intensity and may not always be present.

- [2.] At least 11 positive tender points on physical examination, out of the 18that are listed in the ruling. The tender point sites include those found at the base of the skull, the low cervical spine, the trapezius muscle (or shoulder), the supraspinatus muscle (near the shoulder blade), the second rib, the lateral epicondyle (or outer aspect of the elbow), the gluteal (or top of the buttock), the greater trochanter (below the hip), and the inner aspect of the knee.

- [3.] The evidence must show that other disorders that could cause the symptoms or signs of fibromyalgia were excluded.

Based on the later 2010 Criteria, conditions for a diagnosis of fibromyalgia are met when there all three of the following-

- [1.] A history of widespread pain, similar to the 1990 Criteria.

- [2.] Repeated manifestations of six or more fibromyalgia signs, symptoms, or co- occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.

- [3.] The evidence must show that other disorders that could cause the symptoms or signs of fibromyalgia were excluded, similar to the 1990 Criteria.

To summarize all of the foregoing: There must first be a diagnosis of fibromyalgia from an acceptable medical source. The evidence would need to show that the symptoms of fibromyalgia were not a one-time event, but rather, there needed to be a longitudinal history of the impairment of at least three months in duration. Symptoms, including those involving widespread pain, would need to be consistent with the objective medical criteria as outlined above. And finally, the evidence needed to show that other possible causes for the claimant's symptoms were excluded.

In reviewing the current record, Exhibit Cl-A, which reflects a final decision, shows conclusively that there is no evidence of the kind that would satisfy either the 1990 ACR criteria or the 2010 ACR as to the previously adjudicated period, with the prior ALJ expressly stating he made the finding as an act of administrative grace (p. 17). This being the case, the question is whether there is new and material evidence that shows that the evidence exists now. This must be answered in the negative, for as we will see later in the decision, there is actually less evidence regarding the claimant's alleged fibromyalgia now than there was before. It follows that as to his current application, he is unable to show that the medical evidence of record satisfies the requirements of S.S.R. 12-2p, notwithstanding his history of a diagnosis, and even assuming the diagnosis was given through a medically acceptable source. It is no longer possible to allow the claimant's alleged fibromyalgia to stand as a medically determinable impairment, and the same is removed.

(Tr. 22-24.)

Plaintiff does not point to any evidence in the record that ALJ Shimer did not properly consider in determining that his fibromyalgia was not severe, nor does he suggest that, even if ALJ Shimer had found his fibromyalgia to be a severe impairment,

his RFC would be different or that he would be found disabled. As is manifest from the quoted passage above, ALJ Shimer amply explained why he did not find Plaintiff's fibromyalgia diagnoses to be severe and why ALJ Miller's finding that Plaintiff's fibromyalgia was a severe impairment did not dictate that ALJ Shimer make the same finding.

ALJ Shimer explained that since ALJ Miller's decision, the SSA had promulgated a new rule, 12-2p, specifying how ALJ's must evaluate a fibromyalgia diagnosis, and that the evidence before ALJ Miller and the evidence of record in this case was insufficient to satisfy the requirements set forth in S.S.R. 12-2p. (Tr. 22-24.) ALJ Shimer explained that although ALJ Miller found Plaintiff's fibromyalgia to be a severe impairment, he did so only "to provide both the claimant and the treating physician with the benefit of the doubt." (Tr. 22, see also Tr. 97.) ALJ Miller noted that Plaintiff's treating physician's medical source statements identified fibromyalgia as an impairment, and that the consultative evaluation report noted fibromyalgia as an impairment "per patient report." (Id.) However, ALJ Miller made clear that there was little evidence in the record before him to support finding that Plaintiff's fibromyalgia was a severe impairment. (Id.) ALJ Shimer also explained that there was less evidence supporting a finding that Plaintiff's fibromyalgia was severe before him than had been before ALJ Miller. (Tr. 24.) ALJ Shimer then proceeded to carefully go through all the evidence of record in this case. (Tr. 30-37.) It is hard to imagine what additional analysis or explanation Plaintiff believes was required.[9] After considering the evidence before ALJ Miller and in the

---

[9] Strangely, Plaintiff takes issue with what he claims was ALJ Shimer's use of "nothing more than boilerplate language" to discussing the requirements for finding that fibromyalgia was a

instant case, ALJ Shimer concluded that "[i]t is no longer possible to allow the claimant's alleged fibromyalgia to stand as a medically determinable impairment." (Tr. 24.) Substantial evidence supported this conclusion.

As his fourth claim of error, Plaintiff argues that ALJ Shimer failed to perform a function-by-function assessment of his RFC as required by S.S.R. 96-8p, 1996 WL 374184 (July 2, 19976). To be sure, S.S.R. 96–8p mandates that the ALJ "individually assess the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC." Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002). However, case law does not require the ALJ to discuss those capacities for which no limitation is alleged. See id. (listing cases). ALJ Shimer fully specified Plaintiff's exertional and nonexertional limitations in his RFC. As noted above, ALJ Shimer found, based on the evidence in the record, that Plaintiff could perform medium work, as defined in 20 C.F.R. 404.1567(c) and 416.967(c), except with a number of exertional and nonexertional limitations which he fully described, but for brevity's sake, will not be repeated here.[10] Consequently, this argument must be rejected.

---

severe impairment. (Doc. No. 14-1 at Page ID# 528.) However, what Plaintiff calls "boilerplate language" appears to be ALJ Shimer's effort to explain the requirements of SSR 12-2p by quoting portion of the rule and other supporting documents.

[10] Plaintiff dismissively adds that the ALJ Shimer "failed to include substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the rerecord," essentially claiming that ALJ Shimer's RFC was not supported by substantial evidence. Because Plaintiff does not present any substantive arguments in support of this claim, to the extent this issue is not addressed in this Memorandum Opinion, Plaintiff has failed to properly raise or substantiate it.

## VI. Conclusion

In light of the foregoing, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED. An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE